**THOMAS et al. v. BAUMER.**

No. 2958.

District Court, W. D. Pennsylvania.

Sept. 2, 1939.

Patterson, Crawford, Arensberg & Dunn, of Pittsburgh, Pa., and Graham, Yost & Meyers, Morton Meyers, and George M. Spence, all of Johnstown, Pa., for plaintiffs.

Philip N. Shettig, of Ebensburg, Pa., for defendant.

GIBSON, District Judge.

On May 3, 1934, the executors of William R. Thomas filed a bill in equity in the Court of Common Pleas of Cambria County, Pennsylvania, against the then receiver of The First National Bank of Johnstown, Pennsylvania, in which they prayed that the receiver be declared trustee of the estate of said William R. Thomas for 6,200 shares of the stock of the G. C. Murphy Company, then registered in the name of the Bank and in possession of the defendant. The action was later removed to this court.

William R. Thomas died on April 4, 1932. On March 22, 1932, he gave to the First National Bank of Johnstown a note for $120,952.94, payable in six months. As collateral, to secure it and other notes amounting to about $125,000, he deposited 6,200 shares of the stock of the G. C. Murphy Company. The collateral note was in the form in general use and authorized the Bank to sell the stock deposited at public or private sale without notice to the maker upon non-payment at maturity.

The collateral note, with the stock deposited with it, was pledged with the Reconstruction Finance Corporation to secure a loan. Before its maturity date the note was returned to the Bank for collection. It was not paid by the executors of the decedent and later the Bank caused the collateral to be offered at public sale in the office of a broker in Philadelphia, no notice of the sale being given the executors. The Bank was the purchaser of the collateral. Thereafter the Bank credited the maker with the proceeds of the sale and placed upon its stock and bond list the 6,200 shares of G. C. Murphy Company stock. As well as carrying it on its books as stock owned by it, the Bank thereafter reported it as such to the Comptroller of the Currency. After the sale (as supra) the Bank repledged the stock with the Reconstruction Finance Corporation, and it was held as security for the debt of the Bank until April 24, 1934, when the Receiver of the Bank paid the loan and received the stock. Later he sold the stock for an amount considerably more than sufficient to pay the indebtedness of William R. Thomas to the Bank. In this connection, however, it should be noted that no substantial evidence has been introduced which tends to prove that the price at which it was taken over by the Bank was not the fair market value at the time of sale.

Early in 1933 a conservator of the Bank was appointed. He was David Barry, President of the Bank for many years prior thereto. Later he was succeeded by another conservator who, early in 1934, gave way to a Receiver, when the Bank was declared to be insolvent. During all this period the Reconstruction Finance Corporation held the stock of the G. C. Murphy Company as the property of the Bank.

As the facts have been stated thus far, an ordinary transaction is disclosed. The Bank, pursuant to the powers given it by the Thomas note, had taken over the collateral in a proper way after non-payment of the note upon maturity. On May 3, 1934, however, the instant action was in-

stituted in the Court of Common Pleas of Cambria County. Later the suit was removed to this court. On November 22, 1938, an amended Complaint was filed. The original complaint asserts, in effect, that the G. C. Murphy Company stock was transferred by David Barry, President of the Bank, without any authority from the Directors, and that the sale without notice to plaintiffs did not divest the ownership of the collateral from the estate of William R. Thomas. The transfer was made by Barry, it is set forth, because the Reconstruction Finance Corporation had refused to carry the note of William R. Thomas, with the stock as collateral, after maturity as security for its loan to the Bank. The amended complaint alleges conversations with David Barry, as active head of the Bank, in which he is said to have told plaintiffs that the indebtedness of William R. Thomas would be carried by the Bank until further demand was made for payment, and that the G. C. Murphy Company stock would be held as collateral thereon. It further alleges that David Barry stated to plaintiffs that the said stock would be taken over by the Bank in its own name, but that this action was only for the purpose of enabling the Bank to pledge it with the Reconstruction Finance Corporation to secure its loan, and was not intended to divest the ownership of the estate of William R. Thomas in it. Plaintiffs allege that they were induced by these statements of President Barry "not to take the steps which they otherwise would have taken to protect their ownership in and to the 6200 shares of G. C. Murphy stock, and consented to the pledge by the said First National Bank of Johnstown of the 6200 shares of G. C. Murphy stock with the Reconstruction Finance Corporation as collateral to the bank's indebtedness thereto."

■ These conversations were not mentioned in the original complaint. By them plaintiffs seek to set up an oral contract which is not the contract reduced to writing. To establish such a contract the evidence of its existence must be clear and precise. That it measures up to this necessary degree the court is unable to convince itself. The conversations in question were with an officer of the Bank who was dead when the amended complaint was filed and the testimony as to them comes only from plaintiffs, who might easily have misunderstood the officer. That the President of the Bank should express sympathy for plaintiffs when they called upon him a few days after the death of their father, and that he might, in his sympathy, endeavor to reassure them as to the heavy debt of their father, may well be surmised. The father had himself been president of two other banks in Johnstown, and, in view of his large indebtedness, was doubtless quite friendly to the officers of The First National Bank of Johnstown. His notes were not due and nothing could be done at the moment. Under such circumstances, sympathetic and reassuring talk was more than possible, but that the Bank would allow its officer to enter, or that such officer would enter, into such an agreement as is claimed by plaintiffs seems incredible when the respective situations of the Bank and of the estate of William R. Thomas are considered. The estate, judging by values as they existed prior to the transfer of the stock to the bank, was quite insolvent. The bank was in great difficulties. The coming event of declared insolvency had cast its heavy shadow before, and the scrutiny of the Comptroller of the Currency was upon it and upon its officers. Such being the fact it is far from probable that an agreement would be made, entirely without consideration, which would result in the Bank carrying the note and collateral for an indefinite period after maturity. And it did not, if we accept the records as opposed to the testimony of plaintiffs. The collateral was transferred in an apparently regular way, and was pledged with the Reconstruction Finance Corporation as the property of the Bank.

■ That an apparent transfer of title to the G. C. Murphy stock was to be recorded, was known to plaintiffs before the maturity of the collateral note, and was known to them immediately after the sale in Philadelphia. They knew of the pledge to the Reconstruction Finance Corporation, and they must later, at least, have known that the transfer was viewable by the Comptroller as actual. Under these circumstances they did nothing for two years. This fact throws some light upon their equities in this action. If their account of their conversations with David Barry be accepted, their failure to act still remains. If that failure was due to inability to pay the $250,000 for which the collateral was pledged, as seems to the court to be the fact, then they lost their stock, not because they were lulled into security by the statements of Barry and his alleged breach of

trust, but by their inability to meet the obligation of their decedent long past due. If they could have paid that obligation their failure to do so and demand the collateral, under the circumstances, exhibits such a lack of care and diligence as should defeat their claim. A conservator had been appointed for the Bank early in 1933, and later the President of the Bank was removed as conservator, he having been the first so appointed. Under these circumstances the over-due notes of their decedent were allowed to remain in the Bank. That the Murphy stock was pledged to the Reconstruction Finance Corporation does not furnish an excuse for the delay prior to suit. If the stock was pledged for a greater amount than the debt of William R. Thomas the Bank would have been required to substitute other collateral to make up the difference between the debt and the pledged amount. Even in their bill of complaint plaintiffs did not proffer payment of the debt of William R. Thomas and demand return of the stock.

It will be remembered that plaintiffs' only agreement to modify the terms of the collateral note (by their testimony) was with the President of the Bank. Their testimony tends to establish his agency for the Bank in ordinary note transactions, but seems hardly sufficient to establish his authority to bind it to such a contract as is claimed by them. This was not an ordinary note renewal. The notes of the insolvent decedent, less than half secured by the collateral at the time of the alleged agreement, were, according to plaintiffs, to be carried indefinitely by the Bank, without any provision as to their reduction in amount or the payment of accruing interest —and this without any consideration or advantage whatsoever to the Bank. Power to make such a termless contract is not to be inferred from any ordinary authority to renew notes or to promise loans, but should be established by specific evidence—which does not exist in the instant case. In fact its existence is denied by the action of the Directors of the tottering bank when, faced with the necessity of securing the loan from the Reconstruction Finance Corporation, they passed a resolution directing the sale and purchase of the William R. Thomas collateral, in order that such collateral could be so used. The "plan" mentioned in the resolution plainly was the endeavor to satisfy the Reconstruction Finance Corporation with the Murphy stock as security in place of the overdue note and the stock. The sale and purchase of the stock by the Bank was part of it. In view of the resolution of the Directors (to which no objection on the part of David Barry is noted) it seems certain that the Bank never authorized the modification of the terms of the collateral note claimed by plaintiffs, and therefore cannot be held guilty of a breach of trust in connection with the Thomas collateral.

The evidence of the plaintiffs having failed to satisfy the court that The First National Bank of Johnstown was holding the G. C. Murphy stock in question in trust for the plaintiffs after taking it over after the maturity of the William R. Thomas note, the bill of complaint must be dismissed.